IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

BARBARA SWANSON, on behalf of
herself and all others similarly situated,

        Plaintiff,

vs.

REXALL SUNDOWN, INC., CARL
DESANTIS, CHRISTIAN A. NAST,
DAMON DESANTIS, GEARY COTTON
and DEAN DESANTIS,

        Defendants.

_____/

**98 - 8933**

CASE NO. **CIV - FERGUSON**

CLASS ACTION COMPLAINT
**MAGISTRATE JUDGE**
JURY TRIAL DEMANDED  **SNOW**

Plaintiff, for her complaint, alleges, on information and belief, as follows:

## JURISDICTION AND VENUE

1.    This action is brought as a class action on behalf of purchasers of the common stock of Rexall Sundown, Inc. ("Rexall" or the "Company") between March 19, 1998 and November 5, 1998, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    This Court has jurisdiction over the subject matter of this action by reason of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein are brought under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).



3.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c).  Rexall maintains its principal executive offices in this District at 851 Broken South Parkway, N.W., Boca Raton, Florida, in the West Palm Beach Division of this Court.  The violations of federal law alleged herein occurred within this District and, on information and belief, the Individual Defendants reside in this District as well.

4.     In connection with the acts and omissions alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the U.S. mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

5.     Plaintiff Barbara Swanson purchased Rexall common stock during the Class Period, as set forth in the accompanying certification which is incorporated herein by reference, and was damaged thereby.

6.     Defendant Rexall is a Florida corporation with its principal place of business at 851 Broken Sound Parkway, N.W., Boca Raton, Florida 33487.  Rexall develops, manufactures, markets and sells vitamins, nutritional supplements and other consumer health products. The Company sells to major retailers and maintains its own mail order catalogue and direct sales force.

7.     Defendant Carl DeSantis, at all times relevant to the allegations herein, served as Chairman of the Board of Rexall.

2

8.      Defendant Christian A. Nast ("Nast"), at all times relevant to the allegations herein, served as President, Chief Executive Officer and a director of Rexall.

9.      Defendant Damon DeSantis, at all times relevant to the allegations herein, served as President of Rexall Showcase International, Inc., the Company's marketing subsidiary. He is also an Executive Vice President and director of Rexall. Damon DeSantis is the son of Carl DeSantis. He is 34 years old.

10.     Defendant Geary Cotton ("Cotton"), at all times relevant to the allegations herein, served as Chief Financial Officer and Treasurer of Rexall.

11.     Defendant Dean DeSantis, at all times material to the allegations herein, served as the Chief Operating Officer and Senior Vice President - Operations of Rexall. Dean DeSantis is the son of Carl DeSantis and the brother of Damon DeSantis. He is 36 years old.

12.     The Defendants named in paragraphs 7 through 11 above are hereinafter referred to as the "Individual Defendants." Each of the Individual Defendants, as a senior officer and/or director of Rexall, was a controlling person of the Company. Each Individual Defendant exercised the power and influence over the affairs of Rexall to cause Rexall to engage in the fraudulent practices complained of herein.

13.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Rexall common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (a) deceived the investing public regarding Rexall's business, its relationship with its principal retail customer, and its growth potential; and (b) caused Plaintiff and other members of the Class to purchase Rexall common stock at artificially inflated prices.

3

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Rexall common stock between March 19, 1998, through November 5, 1998, inclusive (the "Class Period"), and who were damaged thereby (hereinafter the Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Rexall, and the directors, officers and employees of Rexall or its subsidiaries or affiliates, or any entity in which any Defendant has a controlling interest, and the legal representatives, heirs, successors and assigns of any Defendant named herein.

15.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff believes that there are thousands of members of the Class located throughout the United States. As of April 13, 1998, the Company reported that there were 71,363,162 shares of common stock outstanding. Throughout the Class Period, Rexall common stock was actively traded on the NASDAQ National Market System. Record owners and other members of the Class may be identified from records maintained by Rexall and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiff has no interests in conflict with the interests of the Class, and Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in securities and class action litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about Rexall's relationship with its major customer and the effect such relationship was having on the Company's revenues;

d.    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the market for Rexall products, its relationship with its major customer, and the Company's expected growth and profit margins;

e.    whether the market price of Rexall common stock during the Class Period was artificially inflated due to the material misrepresentations and omission of material facts complained of herein; and

5

f.      to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

20.     Rexall develops, manufactures, markets and sells vitamins, nutritional supplements and consumer health products through three channels of distribution.  The Company sells products to retailers, makes direct sales through independent distribution and maintains its own mail order catalogue.

21.     At all times relevant to the allegations herein, Rexall was the nation's largest seller of dietary supplements and vitamins.  It was also one of the most profitable.  Throughout the fiscal year ending August 31, 1998, Rexall consistently surpassed its competitors in profit margins and return on Company assets.  The chart below reflects Rexall's pre-tax profit margins and return on assets as compared to its competitors in the vitamin and nutritional supplement industry.

6

| COMPANY | PRE-TAX PROFIT MARGIN | RETURN ON ASSETS |
|---|---|---|
| Rexall | 20.7% | 21.4% |
| Natures Bounty | 10.2% | 5% |
| General Nutrition | 14.% | 12% |
| Twinlab | 17.2% | 14% |
| Whole Foods Markets | 3.5% | 7.2% |

22.　A recent study commissioned by the *Los Angeles Times* into herbal and nutritional supplement products, and specifically a herbal remedy for depression known as St. John's Wort raised questions as to whether Rexall has been able to obtain such profit margins and return in assets by using inexpensive and inferior quality ingredients, which ingredients result in reduced potency of its products.

23.　The *Los Angeles Times* study commissioned an independent lab to test St. John's Wort products from ten separate manufacturers including Rexall. Rexall's product was one of the lowest scoring products sampled with about 20% of the potency reflected on its label. The active ingredient was the compound hypercin.

24.　Because the vitamin and nutritional supplement industry is largely unregulated by the FDA, there has been little regulatory authority since 1994 over dietary supplements and thus little ability to test the accuracy of a company's labeling.

25.　While use of inexpensive ingredients and limiting the use of more expensive active ingredients in the Company's products may initially result in higher profit margins and return on assets, it can also, once revealed, result in reduced sales to more sophisticated retailers.

Wal-Mart in particular had become responsible for a significant portion of the Company's revenues to retailers during the fiscal year ending August 31, 1998. Beginning with the second quarter of 1998, Wal-Mart represented approximately 42% of Rexall's revenues to retailers and about 30% of total revenues. Wal-Mart has the resources and ability to test the potency of Rexall products, and, on information and belief, began such testing during the Class Period due to inquiries from the *Los Angeles Times*.

## Materially False and Misleading
## Statements Issued During the Class Period

26. On March 19, 1998, Rexall issued a press release announcing its financial results for the second quarter of 1998, the period ending February 28, 1998. The Company reported that sales increased 78% to $115 million from $64.9 million for the same period the prior year, and that pro forma net income increased 67% to $14.7 million from $8.8 million for the same period the prior year. Defendant Nast commented on the results as follows:

> Sales to retailers rose 95% compared to the same period last year, and Rexall Showcase International, the Company's Direct Sales division, posted strong sales gain of 61% compared to the prior year's quarter.
>
> ***
>
> In addition, we continue to see exceptional demand for the entire line of Sundown® herbals which is presently the number one selling herbal line in the total U.S. food, drug and mass markets ... [Emphasis added.]

27. On or about April 4, 1998, Rexall filed a Form 10-Q for the period ending February 28, 1998, with the SEC which was signed by Defendants Carl DeSantis and Cotton and confirmed the previously announced financial results.

28.     The management discussion and analysis section of Rexall's quarterly report for the second quarter ending February 28, 1998, disclosed that 29% of the Company's sales in the second quarter were to one national retailer.  The report also disclosed that for the first six months of the fiscal year, 29% of net sales were to the same retailer.  That retailer is Wal-Mart.

29.     The quarterly report for the second quarter also disclosed a gross profit of $67.3 million, a 71.5% increase over the comparable period in the prior year.  Income, before income tax was reported, was $23.4 million reflecting a net profit margin of 20.2%, a decrease from 21.4% in the prior year.  Profit margins for the six months ending February 28, 1998, were 20.5%.

30.     The release of second quarter 1998 results and the management discussion and analysis section of the quarterly report on Form 10-Q for the quarter ending February 28, 1998, were materially misleading and omitted to state material facts in several respects.  First, statements regarding the Company's sales and the reported profit margins for the second quarter of 1998 and first six months of the 1998 fiscal year failed to reflect a growing tension between Rexall and its major customer, Wal-Mart, with respect to the quality of certain of Rexall's products. The Individual Defendants were aware that Wal-Mart was raising questions with respect to the quality of certain of the Company's products.  Thus, while Wal-Mart continued to constitute 29% of the Company's sales, and approximately 42% of retail sales, management was aware, but failed to disclose that that percentage was in danger of decreasing significantly as Wal-Mart was considering reducing its purchases from Rexall due to quality concerns, and the decision to start its own private label brand.  This in turn would have a material effect on the Company's ability

9

to generate continued revenue growth and profit margins in excess of 20%, which were well above its peers in its industry.

31.    On June 15, 1998, an article in *The Wall Street Journal* reported on a presentation made by Defendant Nast at a recent Piper Jaffray investment conference. The article stated in pertinent part:

> Following a presentation at the recent Piper Jaffray investor conference here, Christian A. Nast, Rexall Sundown's chief executive officer, said Wal-Mart always has been in the private label business depending on its needs.
>
> "We're very supportive of their business," Mr. Nast said. "We aren't concerned."
>
> About 33% of Rexall's sales in recent periods came from sales of its pills to Wal-Mart. About 46% of its products are distributed through food, mass market and drug retailers.
>
> Besides Rexall vitamin supplements are the lowest-priced among branded vitamins in the industry, Mr. Nast asserted.
>
> He painted an optimistic growth picture for the Boca Raton, Fla. company and said sales and earnings are expected to grow 25% to 35% annually, topping the industry's growth rate.

The article also noted that Defendant Nast had stated at the conference that he was "very comfortable" with Piper Jaffray analyst Allan F. Hockok's fiscal 1998 earnings estimate of 92 cents a share.

32.    On June 17, 1998, Rexall issued a press release announcing its financial results for the third quarter of 1998, the period ending May 31, 1998. The Company reported that sales increased 101% to $151 million from $75 million for the same period the prior year, and

that pro forma net income increased 103% to $19.4 million from $9.8 million for the same period

the prior year.  Defendant Nast commented on the results as follows:

> We are very proud to have achieved this dramatic level of sales and
> net income growth.  Sales to retailers rose 156% compared to the
> same period last year, and Rexall Showcase International, the
> Company's direct sales division, continued its success, posting
> strong sales gain of 45% compared to the prior year's quarter.
> More impressive is the fact that our third quarter operating margin
> of 19.8% increased 1.7 points, compared to the third quarter of
> fiscal 1997, despite the increase in our investment in advertising,
> research and product development and manufacturing capacity.

33.     On or about July 5, 1998, Rexall filed a Form 10-Q for the period ending

May 31, 1998, with the SEC which was signed by Defendants Carl DeSantis and Cotton, and

confirmed the previously announced financial results.

34.     The third quarter report disclosed that the unidentified major national retailer

represented approximately 31% of net sales for the three months ended May 31, 1998, and 30%

of net sales for the nine months ended May 31, 1998.  Gross profit margins for the quarter were

reported at 56.8%, and net profit margins for the quarter ending May 31, 1998 were reported at

20.5%.

35.     The third quarter report went on to state:

> Of the $175.1 million increase [in net sales], sales to retailers
> accounted for $133.5 million, an increase of 116.4% over the
> comparable period in fiscal 1997.  The increase in sales to retailers
> was primarily attributable to increased sales in distribution to the
> company's existing customer-based business, new account distribu-
> tion as well as new product introductions.

36.     The Company's announcements regarding third quarter results of operations

and the management discussion and analysis section of the third quarter report were materially

misleading and omitted to state material facts with respect to the Company's relationship with its

major customer, Wal-Mart.  Specifically, management knew that sales to Wal-Mart were likely

to decrease for two reasons.  First, Wal-Mart had been increasing its private label herbal products

during the third quarter of the 1998 fiscal year, a fact which Rexall management was well aware.

Second, Wal-Mart had determined to undergo testing of the vitamin and herbal supplements sold

in its stores in response to inquiries Wal-Mart had received from the *Los Angeles Times*.  The

Company's quarterly filing for the third quarter report failed to disclose any of these material facts

which would in turn have a material effect on the Company's business.

> 37.    On August 5, 1998, Rexall issued a press release announcing that "the

company remains confident regarding its outlook for the fiscal year ending August 31, 1998."

Defendant Nast was quoted as follows:

> Based on the information available to date, we remain on track to
> deliver record revenues and record earnings for the fiscal year to
> finish what has been a banner year for the company ...
>
> Thus, far, our year-over-year growth has outpaced that of the
> industry, establishing Rexall Sundown as the leader in the category.
> Industry trends remain positive and our products continue to be well
> received by consumers and retailers alike reinforcing our confidence
> in the future.

In an apparent response to a price decline in the Company's stock on the prior trading day, Mr.

Nast further commented:

> We believe that the reason for the decline was related to comments
> made regarding pricing dynamics in the health food channel of
> distribution.  In our judgment, this event in no way impacts
> negatively on the growth prospects of the vitamin and nutritional
> supplement industry or on the basic, inherent strength of Rexall
> Sundown.  Our current and future position as the leader in the

vitamin and nutritional supplement industry remains unchanged...

38.     The August 5, 1998 press release was false and misleading in that industry trends were not positive due to increased scepticism about the potency and labeling of certain products industrywide, and the Company's products in particular.

39.     On Monday, August 31, 1998, the *Los Angeles Times* published the results of its independent analysis of various brands of St. John's Wort.  The study reported the results of an independent lab analysis of  the levels of hypercin in St. John's Wort products sold by Rexall and nine of its competitors.  The article stated with respect to Rexall's Sundown product:

> In the test, one of the lowest scoring products sampled with about 20% labeled potency was from Sundown Herbals, a division of Rexall, the nation's number one distributor of dietary supplements.

40.     The *Los Angeles Times* article went on to note that Deborah Sure Trinker, Rexall's Vice President for Regulatory Affairs, disputed the results of the article.  The article stated that the *Times* arranged for a second lab to analyze Rexall's products, but that that lab's findings were consistent with the original results.

41.     As a result of the *Los Angeles Times*' study, efforts at Wal-Mart to examine the potency of certain herbal and vitamin products accelerated.   At this point, Individual Defendants knew or recklessly disregarded that its major retail customer, Wal-Mart, was seriously re-evaluating the relationship with Rexall and would be taking steps to reduce purchases in the near future.

42.     On September 12, 1998, a Massachusetts-based "Off Wall Street Consulting Group" reportedly told *Barron's* that "industry sources are telling him a number of Rexall

13

Sundown, Inc. products could have a shortfall in active ingredients." Rexall was supposedly among his list of recommended short sales.

43. On September 16, 1998, the respected *New England Journal of Medicine* released an editorial which argued that herbal remedies and other alternative medicines should undergo more rigorous testing for safety and effectiveness just like conventional drugs before allowed on the market. The report noted that a number of dietary supplements had varying degrees of potency, and that the quality, content and consistency of potency levels varied due to lack of FDA regulation.

44. On September 29, 1998, Rexall issued a press release announcing that its Board of Directors had authorized a share repurchase program which will allow the Company to buy up to $100 million of Rexall Sundown common stock. Stock repurchase programs are often employed as a device to prop up a company's stock price. The press release stated:

> The action taken by the Board of Directors reflects our continued confidence in the Company, its future growth potential and our positive outlook regarding the long-term fundamentals of the vitamin and nutritional supplement industry," said Carl DeSantis, Chairman of the Board. "The Board believes that this repurchase program represents an attractive investment opportunity that will benefit our shareholders."

45. On October 7, 1998, Rexall issued a press release announcing its financial results for the fourth quarter of 1998, the period ending August 31, 1998, and the entire fiscal 1998 financial results. The Company reported that sales for the fourth quarter increased 73% to $153.6 million from $88.6 million for the same period the prior year, and that pro forma net income increased 81% to $20.6 million from the same period the prior year.

46. Defendant Nast was quoted in the October 7, 1998 release:

14

We once again achieved outstanding revenue and net income growth … More impressive is the fact that our fourth quarter operating margins of 20.6% increased approximately 1.9 points compared to the fourth quarter of 1997, during a period where we more than doubled our investment in advertising and product development.

\*\*\*

We continue to achieve a substantially higher sales growth rate compared to the overall nutritional industry reflecting our continued success at gaining new distribution, broadening distribution within our existing accounts, expanding our direct sales distributor base and introducing innovative new science-based products.

47.    The statements in the October 7, 1998 release regarding fourth quarter and year end results of operations were false and misleading, and omitted to state material facts. Specifically, at this point, the Individual Defendants knew that Wal-Mart was actively engaged in developing its own private label brand products, and was conducting its own testing of Rexall products for potency, based on the *Los Angeles Times* study.  The Individual Defendants also knew that there was increasing skepticism about the potency of Rexall products and the accuracy of its labeling.  Thus, the Company's statements regarding increasing profit margins and higher sales growth compared to its competitors failed to acknowledge that those profit margins and growth rates were not likely to continue as a result of already decreasing purchases by Wal-Mart. Further, the Company's disclosures regarding its profit margins were highly misleading in light of the fact that they failed to disclose the extent to which its profit margins were the result of the use of inexpensive, lower quality ingredients and the extent to which the Company was under pressure from its primary retail customer, Wal-Mart, to either increase quality control or lose sales. Finally, on October 7, 1998, the Company knew and was under a disclosure obligation to

reveal that its ability to achieve a higher sales growth rate than its competitors was imperiled due to declining sales to its primarily customer, Wal-Mart.

48.     On November 5, 1998, Rexall announced that it expected that while first quarter 1999 sales would be above the prior year first quarter, earnings per share were expected to be below the $0.20 reported last year.  Consensus analyst estimates had been for $0.28 per share in earnings for the first quarter. The Company primarily attributed its poorer than expected first quarter results to a "slowdown in retail sales within the nutritional industry."  One industry analyst, John Mahoney of Raymond James, noted that for the last four weeks Rexall's revenue declined 6%, which was a greater decline than the industry as a whole.

49.     The price of Rexall plummeted in response to this announcement falling from $22.00 per share to $13.125 per share, a decline of $8.875 per share, or 40%, and a decline of 65% from a Class Period high of $38.375 per share reached on July 13, 1998.

50.     The market for Rexall's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions of material fact, Rexall common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased Rexall common stock at artificially inflated prices and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Rexall stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Specifically, the Defendants:

a.     failed to disclose the extent to which the Company's profit margins were the result of the use of less expensive and inferior quality ingredients in some of its products;

b.     failed to disclose the extent to which its sales and profitability was at risk due to decreasing sales to Wal-Mart due to both the introduction of private label products and questions as to the quality and potency of certain of the Company's products;

c.     misrepresented the extent to which the rate of sales growth and profitability was imperiled due to decreasing purchases from Wal-Mart; and

d.     failed to disclose the extent to which demand for the Company's products was weakening generally due to concerns about the potency and quality control.

52.     The foregoing material misrepresentations and omissions directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.

## APPLICABILITY OF THE
## FRAUD-ON-THE-MARKET DOCTRINE

53.     At all relevant times, the market for Rexall common stock was an efficient market for the following reasons:

a.     Rexall common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ National Market System, a highly efficient market;

b.     As a regulated issuer, Rexall filed periodic public reports with the SEC and the NASD;

c.     Rexall stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers

17

of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

        d.     Rexall regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

        54.    As a result, the market for Rexall securities promptly digested current information with respect to Rexall from all publicly-available sources and reflected such information in Rexall's stock price.  Under these circumstances, all purchasers of Rexall common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## SCIENTER ALLEGATIONS

        55.    Each of the Individual Defendants had both a motive and opportunity to hide the deteriorating relationship between Rexall and its primary customer, Wal-Mart, and to misrepresent the Company's anticipated rate of growth, ability to generate its consistently high profit margins and return on assets, and failed to disclose the extent to which continued sales to Wal-Mart were at risk due to quality concerns.  Each of the Individual Defendants named herein had access to material information with respect to the Company's business, its relationship with Wal-Mart, materials used in its products and other business facts giving rise to the claims asserted herein.  With respect to their motive, each of the Defendants received substantial compensation by reason of their positions as officers and/or directors of the Company.  For example, Defendant Carl DeSantis received in the 1997 fiscal year, salary, bonus and other compensation of $686,954 from the Company.   In addition, he received options to purchase 120,000 shares of the Company's common stock.  Defendant Nast received salary, bonus and other compensation of

$504,585. He also received options to purchase 120,000 shares of the Company's common stock. Defendant Dean DeSantis received salary, bonus and other compensation of $282,159. He also received options to purchase 80,000 shares of the Company's common stock. Defendant Cotton received salary, bonus and other compensation of $276,857. He also received options to purchase 80,000 shares of the Company's common stock. The exercise price of each of the shares granted to the Individual Defendants during 1997 was $11.875, substantially below the market prices at which the Company's common stock traded during the Class Period.

56.     The Individual Defendants also profited from the inflated stock price of Rexall common stock during the Class Period by selling substantial amounts of shares of Rexall's common stock in the open market. Specifically, Defendant Carl DeSantis sold during the Class Period a total of 463,000 shares at prices ranging from $32.93 per share to $37.59 per share, for total proceeds of over $16,400,000. His wife, Sylvia, also sold an additional 50,000 shares for total proceeds of over $1,850,000. Defendant Nast sold during the Class Period 235,021 shares of the Company's common stock at prices ranging from $34.44 to $36.21 with gross proceeds of over $8,375,000. Defendant Geary sold 40,000 shares of the Company's common stock at prices ranging from $34.44 to $36.21 for gross proceeds of approximately $1,424,000. Defendant Dean DeSantis sold 52,150 shares of Rexall common stock during the Class Period for proceeds of over $2,200,000.

57.     In authorizing, signing and otherwise disseminating the false statements of material fact and in omitting to state material facts necessary to make the statements made not misleading, each of the Individual Defendants acted knowingly and/or recklessly thereby acting with scienter as that term is defined at law.

## COUNT I
## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
## AND RULE 10b-5

58.     Plaintiff repeats and realleges all prior allegations as though fully set forth herein.

59.     During the Class Period, each of the Defendants knowingly and/or recklessly disseminated materially false and misleading information to the investing public regarding the Company's relationship with its major customer, Wal-Mart; the Company's general financial condition, profit margins and the quality of its products.

60.     Each of the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by disseminating the false statements of material fact and omitting to state material facts necessary to make the statements made not misleading as more fully alleged herein.

61.     Plaintiff and the Class have suffered damages that were proximately caused by the misrepresentations of material fact and omissions of material fact more fully alleged herein.

## COUNT II
## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
## AGAINST EACH INDIVIDUAL DEFENDANT

62.     Plaintiff repeats and realleges each allegation as though fully set forth herein.

63.     Each of the Individual Defendants by reason of their positions as officers and/or directors of Rexall were control persons within the meaning of Section 20(a) of the Exchange Act.  By reason of their executive positions and positions on the Board, they had the power and authority, and exercised such power and authority to cause the Company to issue the

20

materially false and misleading statements more fully described herein.   By reason of the violations of the Exchange Act more fully alleged herein, each of the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to Plaintiff and the Class.   As a direct and proximate result of the violations of law alleged herein, Plaintiff and the Class have sustained damage in that they acquired Rexall shares at artificially inflated prices.

WHEREFORE, pursuant to the foregoing, Plaintiff prays that judgment be entered as follows:

a.   certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.   entering judgment in favor of the Plaintiff and the Class on the claims asserted herein;

c.   awarding Plaintiff and the Class compensatory damages for the violations of law alleged herein; and

d.   awarding Plaintiff costs and such other relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated:  December 18, 1998          Respectfully submitted,

BURT & PUCILLO, LLP

By: _____

Michael J. Pucillo
Florida Bar No. 261033
Wendy H. Zoberman
Florida Bar No. 434670

21

222 Lakeview Avenue
Esperanté Bldg., Suite 300 East
West Palm Beach, FL  33401
561/835-9400

and

Sherrie R. Savett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103
215/875-3000

**Counsel for Plaintiff**

H:\Judy\60112\complaint.swn

22

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Barbara Swanson ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in the security that is the subject of this action during the Class Period is/are as follows:

| Security | Transaction (No./Shares & Price Per Share | Date |
|---|---|---|
| Rexall Sundown, Inc. | Bought 300 shares at $32 per share | 4/28/98 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action filed under the federal securities laws.

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _8th_ day of _December_ , 1998, at Gresham, Oregon.

_Barbara Swanson_
Barbara Swanson

H:\Judy\60112\ClassMembers\swanson.cer

JS 44
Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**98 - 8933**

**CIV - FERGUSON**

**MAGISTRATE JUDGE SNOW**

| **(a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Barbara Swanson | Rexall Sundown, Inc., Carl DeSantis, Christian A. Nast, Damon DeSantis, Geary Cotton and Dean DeSantis |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME ADDRESS, AND TELEPHONE NUMBER)
Michael J. Pucillo, Esq., Burt & Pucillo, LLP 222 Lakeview Ave., #300 E, West Palm Beach, FL 33401, 561/835-9400

ATTORNEYS (IF KNOWN) Plaintiff's Co-Counsel: Sherrie R. Savett, Esq., Berger & Montague, P.C., 1622 Locust St., Philadelphia, PA 19103, 215/875-3000

(d) CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   (PALM BEACH),   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ◻ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ◻ 2 U.S. Government Defendant
- ◻ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ◻ 1 | ◻ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ◻ 4 |
| Citizen of Another State | ◻ 2 | ◻ 2 | Incorporated and Principal Place of Business In Another State | ◻ 5 | ◻ 5 |
| Citizen or Subject of a Foreign Country | ◻ 3 | ◻ 3 | Foreign Nation | ◻ 6 | ◻ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ◻ 2 Removed from State Court
- ◻ 3 Remanded from Appellate Court
- ◻ 4 Reinstated or Reopened
- ◻ 5 Transferred from another district (specify)
- ◻ 6 Multidistrict Litigation
- ◻ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ◻ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B◻ 610 Agriculture | ◻ 422 Appeal 28 USC 158 | ◻ 400 State Reapportionment |
| ◻ 120 Marine | ◻ 310 Airplane | ◻ 362 Personal Injury — Med Malpractice | B◻ 620 Other Food & Drug | ◻ 423 Withdrawal 28 USC 157 | ◻ 410 Antitrust |
| ◻ 130 Miller Act | ◻ 315 Airplane Product Liability | ◻ 365 Personal Injury — Product Liability | B◻ 625 Drug Related Seizure of Property 21 USC 881 | | ◻ 430 Banks and Banking |
| ◻ 140 Negotiable Instrument | ◻ 320 Assault, Libel & Slander | ◻ 368 Asbestos Personal Injury Product Liability | B◻ 630 Liquor Laws | **A PROPERTY RIGHTS** | B◻ 450 Commerce/ICC Rates/etc |
| ◻ 150 Recovery of Overpayment & Enforcement of Judgment | ◻ 330 Federal Employers Liability | | B◻ 640 R.R. & Truck | ◻ 820 Copyrights | ◻ 460 Deportation |
| ◻ 151 Medicare Act | ◻ 340 Marine | **PERSONAL PROPERTY** | B◻ 650 Airline Regs | ◻ 830 Patent | ◻ 470 Racketeer Influenced and Corrupt Organizations |
| ◻ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ◻ 345 Marine Product Liability | ◻ 370 Other Fraud | B◻ 660 Occupational Safety/Health | ◻ 840 Trademark | ◻ 810 Selective Service |
| ◻ 153 Recovery of Overpayment of Veteran's Benefits | ◻ 350 Motor Vehicle | ◻ 371 Truth in Lending | B◻ 690 Other | **B SOCIAL SECURITY** | ☒ 850 Securities/Commodities/Exchange |
| ◻ 160 Stockholders' Suits | ◻ 355 Motor Vehicle Product Liability | ◻ 380 Other Personal Property Damage | **A LABOR** | ◻ 861 HIA (1395ff) | ◻ 875 Customer Challenge 12 USC 3410 |
| ◻ 190 Other Contract | ◻ 360 Other Personal Injury | ◻ 385 Property Damage Product Liability | ◻ 710 Fair Labor Standards Act | ◻ 862 Black Lung (923) | ◻ 891 Agricultural Acts |
| ◻ 195 Contract Product Liability | | | ◻ 720 Labor/Mgmt. Relations | ◻ 863 DIWC/DIWW (405(g)) | ◻ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ◻ 730 Labor/Mgmt. Reporting & Disclosure Act | ◻ 864 SSID Title XVI | ◻ 893 Environmental Matters |
| ◻ 210 Land Condemnation | ◻ 441 Voting | B◻ 510 Motions to Vacate Sentence | ◻ 740 Railway Labor Act | ◻ 865 RSI (405(g)) | ◻ 894 Energy Allocation Act |
| ◻ 220 Foreclosure | ◻ 442 Employment | **HABEAS CORPUS:** | ◻ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ◻ 895 Freedom of Information Act |
| ◻ 230 Rent Lease & Ejectment | ◻ 443 Housing/ Accommodations | B◻ 530 General | ◻ 791 Empl. Ret. Inc. Security Act | A◻ 870 Taxes (U.S. Plaintiff or Defendant) | ◻ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ◻ 240 Torts to Land | ◻ 444 Welfare | B◻ 535 Death Penalty | | A◻ 871 IRS — Third Party 26 USC 7609 | ◻ 950 Constitutionality of State Statutes |
| ◻ 245 Tort Product Liability | ◻ 440 Other Civil Rights | B◻ 540 Mandamus & Other | | | ◻ 890 Other Statutory Actions |
| ◻ 290 All Other Real Property | | B◻ 550 Civil Rights | | | A OR B |
| | | B◻ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 USC Sections 78j(b) and 78t(a)

LENGTH OF TRIAL via 10 days estimated (for both sides to try entire case)

| **VII. REQUESTED IN COMPLAINT:** | ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** | CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ YES ◻ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See instructions):   JUDGE Dmitrouleas   DOCKET NUMBER 98-8798

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 12/18/98 | Michael J. Pucillo, Esq. |

**FOR OFFICE USE ONLY**

RECEIPT 209681   AMOUNT $150.00   APPLYING IFP _____   JUDGE Ferguson   MAG JUDGE Snow